**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| CHARLENE CESTRONI, TRUSTEE OF DUFFY )<br>ASSET MANAGEMENT, LLC, )<br>DAVID DUFFY, )<br>LYNEL DUFFY, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>NORTHSTAR FUNDING PARTNERS, )<br> )<br>Defendant. ) | Case No. 1:22-cv-00985-TWP-KMB |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Northstar Funding Partners' ("Northstar") Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 (Filing No. 45). Plaintiffs Charlene Cestroni, Trustee of Duffy Asset Management, LLC (the "Trustee"), David Duffy and Lynel Duffy (David and Lynel Duffy together, the "Duffys") (collectively, "Plaintiffs") initiated this action after the Duffys' life insurance policy failed to perform as expected and they terminated the policy. Plaintiffs assert claims for negligence, fraud, fraud in the inducement, constructive fraud, and breach of contract against Northstar. For the following reasons, Northstar's Motion for Summary Judgment is **granted**.

## I.   BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Plaintiffs as the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

In or around 2011 or 2012, the Duffys met Parker, an independent insurance agent, through family connections (Filing No. 48 at 3). When they met, Parker asked the Duffys if they had any life insurance needs and mentioned several life insurance options for David Duffy, including a premium finance life insurance policy. *Id.* Parker was "affiliated" with an independent marketing organization called Simplicity Life ("Simplicity") and during his twenty-five-year career placed all his business through Simplicity. *Id.* at 13. Parker had never previously sold a premium financed life insurance program. The idea of proposing a premium finance policy came from Steve Jacobson ("Jacobson"), whom Parker knew through Simplicity. A premium finance policy is a high-premium life insurance policy for which the insured finances the premiums through a loan. Ideally, the high premium payments will yield returns that, over time, become large enough to not only fund the policy premiums (eliminating the need for a loan) but also provide the insured with a stream of income. *Id.*

The Duffys expressed interest in a premium finance policy, and Jacobson suggested involving Northstar. *Id.* at 4. Northstar is, essentially, an insurance broker. Northstar assists insurance agents in creating premium finance case designs for the agents' clients. *Id.* Jacobson arranged an introductory phone call between David Duffy, Parker, and Kim Coulter ("Coulter"), a representative of Northstar. During the call, Coulter presented an outline of the premium finance process and an overview of Northstar's qualifications. *Id.* Coulter stated that he had worked on hundreds, if not thousands, of premium finance deals in the past (Filing No. 48-2 at 8; Filing No. 69-5 at 6). During the call, David Duffy was shown projections for returns on a premium finance policy issued by Allianz Insurance and Investment ("Allianz"). Parker and Coulter told David Duffy that the projections he was being shown were "super low" and "not even realistic," because premium finance policies through Allianz typically performed much better than projected (Filing

No. 69-5 at 7). There is no evidence that Northstar corresponded with the Duffys between this initial phone call and the issuance of the Allianz policy at issue in 2015 (Filing No. 48 at 4).

The Duffys proceeded with obtaining a premium finance life insurance policy through Allianz. To begin the process, Northstar provided a questionnaire[1] to obtain information about Parker and the Duffys (Filing No. 48 at 4). Parker also helped the Duffys complete a loan underwriting form. *Id.* Additionally, the Duffys received several illustrations from Allianz (Filing No. 48-6) and "quick views" from Northstar (Filing No. 48-7) projecting how the policy and financing might work (Filing No. 48 at 5). Both the Allianz illustrations and Northstar "quick views" state they were "prepared by" Parker for the Duffys, although Parker did not prepare them.

To fund the policy premiums, the Duffys applied for a loan through Global One Finance ("G1"). The loan would be secured by a line of credit issued by Stock Yards Bank, with the cash surrender of the policy serving as collateral (Filing No. 48 at 6). Before Allianz issued the policy, both Allianz and G1 performed underwriting on Plaintiffs. For the underwriting process, the Duffys completed several forms, including a Supplement to the Life Insurance Application Personal Finance Questionnaire (Filing No. 48-8) and a Premium Financing Disclosure Form (Filing No. 48-9). After underwriting was completed, G1 approved and issued the loan for the first policy year, and in April 2015, Allianz issued life insurance policy no. 60078973 (the "Policy") (Filing No. 1-1).

After the first year of the Policy, the Duffys were notified that the cash surrender value of the Policy was no longer sufficient to secure their G1 loan, and the Duffys were required to pay additional monies and increase their letter of credit to obtain a loan for the next Policy year (Filing

---

[1] The parties do not clarify whether Northstar provided this questionnaire directly to the Duffys or to Parker, but this detail is immaterial for purposes of summary judgment.

No. 48 at 7). This same process occurred every year until March 2019, when Plaintiffs elected to terminate the Policy. *Id.*

In June 2021, Plaintiffs initiated this action in state court, asserting claims for negligence, breach of contract, fraud, fraud in the inducement, and constructive fraud against Parker and Northstar (Filing No. 1-1). Plaintiffs' Complaint alleged, in part, that Parker was acting as an agent of Northstar (Filing No. 48 at 7). On January 8, 2022, Plaintiffs and Parker entered into a General Release and Confidentiality Agreement (the "Release Agreement") (Filing No. 1-2 at 9; Filing No. 69-4). On March 3, 2022, Plaintiffs and Parker filed a joint stipulation of dismissal as to Parker, and the same day, the state court dismissed Plaintiffs' claims against Parker with prejudice (Filing No. 1-2 at 9). The Duffys did not intend to release Northstar when they settled with and released Parker. (Filing No. 69-3). Northstar removed this action to federal court on May 17, 2022, and moved for summary judgment on April 7, 2023 (Filing No. 1; Filing No. 45).

## II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a

4

genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.   DISCUSSION

In its Motion for Summary Judgment, Northstar asserts a variety of grounds for dismissal of Plaintiffs' claims. Northstar first argues that Plaintiffs' negligence and fraud claims, to the extent they are premised on vicarious liability, should be dismissed because the Release Agreement with Parker also released Northstar from vicarious liability, and because Parker was not Northstar's actual or apparent agent. Northstar further argues that Plaintiffs' claims are all governed by a two-year statute of limitations and are time-barred. Next, Northstar contends that Plaintiffs' fraud claims should be dismissed because Northstar did not make any actionable misrepresentations under Indiana law, and because Northstar disclaimed any alleged misstatements in documents signed by the Duffys. And finally, Northstar argues that Plaintiff's breach of contract claim should be dismissed because Plaintiffs cannot show a contract between them and Northstar.

Plaintiffs respond that the Release Agreement with Parker did not also release Northstar; that they have sufficiently shown that Parker was Northstar's apparent agent; that their claims are

5

not time-barred; that they have shown actionable misrepresentations by Parker and Northstar; and that Northstar breached an oral contract with Plaintiffs. The Court will address each of Northstar's arguments in turn.

**A.      Whether Plaintiffs' Vicarious Liability Claims Must be Dismissed**

Northstar first argues that it cannot be held vicariously liable for Parker's alleged misconduct because Plaintiffs' settlement with Parker released Northstar from liability, and because Plaintiffs cannot show that Parker was Northstar's actual or apparent agent.

**1.   Release Agreement with Parker**

Northstar first argues that any claims against it, to the extent they are premised on vicarious liability, must be dismissed because Plaintiffs' settlement agreement with Parker released Northstar from liability (Filing No. 48 at 9). Plaintiffs respond that Northstar has waived the affirmative defense of release and, even if Northstar could raise the defense, Northstar was not released by the Release Agreement with Parker. The Court need not address whether Northstar's release defense has been waived because this defense is unsuccessful on its merits.

Northstar argues that under Indiana law, Plaintiffs' Release Agreement with Parker automatically released Northstar from all vicarious liability, regardless of whether Plaintiffs and Parker intended for the Release Agreement to do so. In support of its position, Northstar cites the general principle of Indiana law that "[i]f the servant or agent is released of liability, no liability can be imputed to the principal." *Comer-Marquardt v. A-1 Glassworks, LLC*, 806 N.E.2d 883, 887 (Ind., Ct. App. 2004) (citing *Grzan v. Charter Hosp. of Nw. Ind.*, 702 N.E.2d 786, 792 (Ind. Ct. App. 1998)). Northstar also cites a treatise that asserts "[s]ettlement with an agent constitutes settlement with the principal, as far as the principal's potential liability is solely derivative, no matter what the parties may have intended." 15A C.J.S. Compromise & Settlement § 50. Plaintiffs respond that under *Pelo v. Franklin College of Indiana*, 715 N.E.2d 365 (Ind. 1999), a contractual

6

release of liability against an agent does not necessarily release the principal, and a court must look to the language of the release agreement to determine its scope.

In *Pelo*, the plaintiff was injured in a collision with a car driven by Lee in the scope of her employment with Franklin College. *Id.* at 366. The plaintiff sued Lee and Franklin College, as Lee's principal. Plaintiff later entered into a settlement and release agreement with Lee. Franklin College then moved for summary judgment, arguing that the release of Lee operated as a release of Franklin. *Id.* Franklin College relied on *United Farm Bureau Mut. Ins. Co. v. Blossom Chevrolet*, 668 N.E.2d 1289 (Ind. Ct. App. 1996), "which took the view that if a party's liability is solely derivative of a second party's liability, a release of the latter terminated the liability of the former as a matter of law." *Pelo*, 715 N.E.2d at 366. That is the same view Northstar asks the Court to take. However, the *Pelo* court disapproved of *Blossom Chevrolet*. The *Pelo* court explained:

> The primary mischief in the *Blossom Chevrolet* rule is that it sets a trap for those litigants who are unaware of the exception for cases based on derivative liability, notwithstanding the general rule announced in *Huffman* that a release will operate as the parties intended. The law is not a game where the litigant with the lawyer who happens to know all the traps wins.

*Id.* at 366.

The *Pelo* court held that settlement and release agreements should be construed like any other contract. "[W]hen parties sign an agreement releasing one defendant with the clearly expressed expectation that they will be able to proceed against others, that expectation should be given effect by the courts." *Id.* Stated differently, under *Pelo*, settlement and release agreements with an agent do not automatically release the principal from liability. Courts must look to the agreement itself to determine whether the parties intended to also release the principal.

On reply, Northstar argues that "post-*Pelo*, Indiana courts continue to follow the general rule that 'once the servant or agent is released of liability, no negligence can be imputed to the principal." *Grzan*, 702 N.E.2d 786. This principle, however, applies only where the agent has been

absolved by verdict or judgment, not by private agreement. In *Grzan v. Charter Hospital of Northwest Indiana*, 702 N.E.2d 786 (Ind. Ct. App. 1998), a post-*Pelo* case cited by Northstar, the Indiana Court of Appeals held that the alleged principal could not be held liable under the doctrine of respondeat superior because the trial court had properly entered summary judgment in favor of the alleged agent. *Id.* at 792. And in *Comer-Marquardt v. A-1 Glassworks, LLC*, 806 N.E.2d 883 (Ind. Ct. App. 2004), the Indiana Court of Appeals held that a default judgment against a principal should be set aside because the agent's liability had not yet been decided, and the default judgment against the principal "would allow a potentially absurd and unjust result of [the agent] being absolved of any wrongdoing but her company . . . being held liable for that very same alleged wrongdoing." *Id.* at 888. To be sure, the Indiana Supreme Court has explained that "the reason for this general rule is that because, under the doctrine of respondeat superior, an employer has a right of action for indemnity against an employee if the employer is found liable for the employee's conduct, '"and such right would be defeated by a *verdict and judgment* which released the [employee].""" *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 252 (Ind. Ct. App. 2013) (emphasis added).

Even before *Pelo*, the Indiana Supreme Court held that recovery against a principal is not necessarily precluded "where the evidence shows that the negligence of [a] servant . . . who if joined as a party *is not exonerated by the verdict*, has caused the injury." *Health & Hospital Corp. of Marion Cnty. v. Gaither*, 397 N.E.2d 589, 260 (Ind. 1979) (emphasis added) (quoting *Estes v. Hancock Co. Bank*, 289 N.E.2d 728, 730 (Ind. 1972)). The principle cited by Northstar thus applies to situations in which the agent has been affirmatively absolved of liability, not situations like this one, in which the agent has been released by agreement, without any final determination as to liability.

Northstar's reliance on treatise is also unavailing (Filing No. 48 at 9 (citing 15A C.J.S. Compromise & Settlement § 50)). The treatise's statement that a settlement with an agent constitutes a settlement with the principal, regardless of the parties' intent, is based on cases from Illinois and Nebraska, and it is contradictory to the Indiana Supreme Court's decision in *Pelo*.

*Pelo* is therefore controlling here. There has been no verdict, judgment, or other final determination as to Parker's liability (Filing No. 46-1 at 3, § VI ("The Parties represent, warrant, and agree that this Release represents the compromise of disputed claims, and that the terms, covenants, and payments set forth in this Release are not to be construed as an admission of liability by **Parker** and that all liability is expressly denied by **Parker**." (emphasis in original))). The Release Agreement thus did not automatically release Northstar.

The Court must look to the language of the release agreement itself to determine whether the Plaintiffs and Parker intended to release Northstar. Northstar argues that they did. Northstar notes that the Release Agreement released Parker and his "affiliates," and that "[a]gency is clearly a form of affiliation between two parties." (Filing No. 48 at 9). Northstar's argument is unavailing. It relies on a strained interpretation of one term in a boilerplate release provision. And, more importantly, it ignores the parties' clear and unambiguous statement in Section 1 of the release agreement that "[c]laims against NorthStar shall remain pending and unaffected by this Release" (Filing No. 46-1 at 2). The Release Agreement provides that the parties did not intend to release any of Plaintiffs' claims against Northstar, so Northstar is not entitled to summary judgment on the basis of release.

### 2.  Actual or Apparent Agency

Northstar next argues that Plaintiffs' vicarious liability claims against Northstar must be dismissed because Parker was not Northstar's actual or apparent agent. In their response, Plaintiffs

appear to concede that Parker was not Northstar's actual agent, but they contend that Parker was Northstar's apparent agent.

"Vicarious liability is 'indirect legal responsibility.' ... It is a legal fiction by which a court can hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship to the wrongdoer." *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind. 1999) (quoting Black's Law Dictionary 1404 (5th ed. 1979)). Indiana courts have imposed vicarious liability on principals for the acts of their apparent agents. "Apparent agency may be established when a third party reasonably believes there is a principal-agent relationship based on the principal's manifestations to the third party." *Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1068 (Ind. 2022); *Clark*, 209 N.E.3d at 448 ("[A]pparent agency does not depend on the principal's express or implied authorization for the agent to act on the principal's behalf; rather, apparent agency exists when 'a principal's manifestations induce a third party to reasonably believe there is a principal-relationship.'" (quoting *Arrendale*, 183 N.E.3d at 1068) (citing *Pepkowski v. Life of Ind. Ins. Co.*, 535 N.E.2d 1164, 1167 (Ind. 1989))).

In their response, Plaintiffs identify several ways in which Northstar purportedly manifested its agency relationship with Parker (Filing No. 68 at 13). First, Plaintiffs contend that during David Duffy's initial call with Coulter and Parker, both Coulter and Parker stated that they were working on the deal together, and that they had done "lots of deals" together. This assertion mischaracterizes David Duffy's deposition testimony, on which Plaintiffs rely. In his deposition, David Duffy asserted that he "perceived" Coulter and Parker to be putting the Allianz deal together, not that Coulter or Parker stated as much (Filing No. 69-5 at 3). Additionally, David Duffy testified that Cold stated he had "done hundreds and hundreds" of similar insurance deals (Filing No. 69-5

at 6), but not that he had ever worked with Parker before. Specifically, David Duffy was asked: "Mr. Coulter said that he had done previous deals of a similar nature, but he never said that he had done these deals with Mr. Parker, correct?" David Duffy responded: "*Not that I can recall as worded that way. . . . I just assumed* -- my understanding was that this was something they did all the time, together." *Id.* at 9 (emphasis added). David Duffy was later asked "As you sit here today, can you point to a specific time and a specific call or meeting where Mr. Coulter ever told you that he had worked with Mr. Parker previously?" and David Duffy responded "I just can't recall that right off the top of my head, *no*. But, I mean, I always *felt* that when those guys were talking together that they had done deals together." *Id.* (emphasis added). David Duffy's own testimony confirms that Coulter never told David Duffy that he and Parker "had done hundreds of thousands of premium finance deals *together*," despite David Duffy's assumptions (Filing No. 68 at 22 (emphasis in original).

Plaintiffs also contend that Northstar manifested an agency relationship with Parker by joining several conference calls and/or attending meetings with David Duffy and Parker discussing the benefits of a premium finance policy (Filing No. 68 at 14–15). Simply being on a conference call with another person does not imply the existence of an agency relationship. And the substance of these calls, according to Plaintiffs, was the proposed insurance policy, not Northstar's relationship with Parker. Neither Northstar's presence at telephonic or in-person meetings with Parker, nor Northstar's statements about the product that Northstar was attempting to sell, manifested an agency relationship between Northstar and Parker.

Plaintiffs further argue that Northstar "shared in the commission of the sale of the Policy to The Duffys," but Plaintiffs cite no designated evidence showing who designed or proposed the

commission-sharing arrangement (Filing No. 68 at 15). Absent evidence that Northstar proposed the commission-sharing arrangement, it is not a manifestation from Northstar as to agency.

Lastly, Plaintiffs argue that Northstar manifested an agency relationship with Parker by creating several Northstar documents that appeared as though Parker had prepared them, and by placing Parker in a position to advise the Duffys about the policy that Northstar had designed. Specifically, Northstar created analytical models titled "Premium Financing for Life Insurance Cost Analysis." Each model contained Northstar's logo in the bottom right corner, but stated at the top, "Analytical Model Prepared for Dave Duffy by Jim Parker" (Filing No. 48-7 at 2–4).

On reply, Northstar argues that these models are not sufficient manifestations of an apparent agency relationship because: (1) Plaintiffs did not identify these documents, or an apparent agency theory, in their Complaint; (2) the models have been presented "in isolation without a discussion of any other documents or facts"; and (3) it is undisputed that Plaintiffs knew Parker was their agent (Filing No. 70 at 16–17). As to Northstar's first argument, Plaintiffs were not required to cite evidence or plead specific legal theories in their Complaint (Filing No. 62 (holding Plaintiffs were not required to plead a specific agency theory in their Complaint)). Plaintiffs' failure to specifically identify the analytical models or an apparent agency theory in their Complaint is not a basis for rejecting Plaintiffs' arguments on summary judgment. Second, Northstar does not explain what "other documents or facts" Plaintiffs should have identified to provide more context to the analytical models, and underdeveloped arguments are deemed waived. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002) (stating that where party fails to support position with any legal analysis or citation, the argument

is waived). And third, Northstar cites no caselaw supporting its position that Parker cannot be both Plaintiffs agent, for purposes of fiduciary duties, and Northstar's apparent agent, for purposes of vicarious liability. Indeed, doctors, lawyers, therapists, and other professionals are regularly employed as agents of larger organizations for purposes of vicarious liability but still owe their clients fiduciary duties.

The Court concludes that Northstar has not shown it is entitled to summary judgment on the issue of apparent agency. Considering that Northstar prepared and distributed Northstar-branded analytical models purportedly prepared by Parker and made Parker the Duffys' soul resource for completing and submitting their Northstar and Allianz applications, and drawing all reasonable inferences in Plaintiffs' favor, there exists a genuine dispute of material fact as to whether Parker was Northstar's apparent agent. *See Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 678 (Ind. 2001) ("[W]hen [the plaintiff] Isaac first acquired the Gallant policy on her [automobile], a Thompson-Harris employee filled out Isaac's pre-printed insurance application form. After the pre-printed application form and a pre-application checklist were signed by Isaac and the employee, the employee told Isaac that her coverage with Gallant would be 'bound' as of June 2, 1994. . . . [T]he evidence appears to us without dispute that Thompson-Harris had *apparent* authority to bind Gallant, *e.g.*, Gallant's dealings with Isaac just recited contained the manifestations required under applicable case law to cause Isaac reasonably to believe that Thompson-Harris had authority to bind Gallant." (emphasis in original)); *Indy Auto Man, LLC v. Keown & Kratz, LLC*, 114 N.E.3d 32, 35–36 (Ind. Ct. App. 2018) (finding law firm created apparent agency by allowing agent to use firm's mailing address, providing agent with business cards, letterhead, and email address, allowing agent to use Firm's contract information in court filings, and adding agent to malpractice insurance policy); *CR23, LLC v. Diamond Equipment, Inc.*, No. 09-cv-138, 2010 WL 5463393, at

13

*2 (S.D. Ind. Dec. 29, 2010) ("[B]ecause Bangle was acting as the sole negotiator and there was no direct or indirect communication by Ireland, it was reasonable for Defendant to believe that Bangle had authority to complete this transaction.").

**B.      Whether Plaintiffs' Claims are Time-Barred**

Northstar next argues that all of Plaintiffs' claims are a variation of its professional negligence claim against Parker and are therefore governed by Indiana's two-year statute of limitations. Northstar points out that Plaintiffs filed their Complaint more than two years after all the claims accrued and argues all claims should be dismissed as time-barred. The Court will address whether Plaintiffs' negligence, fraud, and breach of contract claims are time-barred in turn.

**1.   Plaintiffs' Negligence Claim**

Whether Plaintiffs' negligence claim is time-barred is a straightforward inquiry. The parties agree that the statute of limitations for claims of professional negligence is two years. Ind. Code § 34-11-2-3; *Overton v. Grillo*, 896 N.E.2d 499, 502 (Ind. 2008); (Filing No. 68 at 16). The parties vigorously dispute when Plaintiffs' claims first accrued, but the parties agree that the claims accrued no later than March 2019, when the Duffys terminated the Policy (Filing No. 68 at 20 ("[T]he statute of limitations on The Duffys' negligence claims did not accrue until they could no longer meet the collateral requirements and were forced to terminate the Policy in March 2019."); *id.* at 21 ("[T]he limitations period for the negligence of Parker and Northstar did not begin to run until the Policy was terminated in March of 2019.")). Plaintiffs did not initiate this action until more than two years later, in June 2021 (Filing No. 1-1).

However, Plaintiffs argue that Northstar is equitably estopped from raising a statute of limitations defense because Parker and Northstar attempted to conceal that the Policy was not performing as expected. But the doctrine of equitable estoppel (also called fraudulent concealment) does not toll the statute of limitations indefinitely or preclude a defendant from ever asserting a

statute of limitations defense. The doctrine only "toll[s] the statute of limitations until the equitable grounds cease to operate as a reason for delay." *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Assoc, Inc.*, 56 N.E.3d 38, (Ind. Ct. App. 2016); *see also Obiefuna v. Hypotec, Inc.*, 451 F. Supp. 3d 928, 942 (S.D. Ind. 2020) (explaining that equitable estoppel "is often referred to as 'fraudulent concealment,' though fraudulent concealment is technically one aspect or example of the broader doctrine of equitable estoppel"). Any alleged fraudulent concealment ended in March 2019, when the Duffys discovered that the Policy was failing and terminated it. Plaintiffs' negligence claims are thus untimely and must be dismissed.[2]

### 2. **Plaintiffs' Fraud Claims**

Plaintiffs assert claims for actual fraud, fraud in the inducement, and constructive fraud (Filing No. 1-1 at 5–8). Northstar argues that all of these claims are barred by Indiana's two-year statute of limitations because the fraud claims, in substance, allege professional negligence. *Whitehouse v. Quinn*, 477 N.E.2d 270, 273–74 (Ind. 1985) ("[T]he appliable statute of limitations is ascertained by identifying the nature of substance of the cause of action.") Plaintiffs respond that their fraud claims do not arise from their allegations of professional malpractice because several of alleged misrepresentations were made before they purchased the Policy "and before there was even a professional relationship," and because Plaintiffs have sufficiently alleged all of the elements of fraud (Filing No. 68 at 17–18).

To start, Plaintiffs entirely fail to support their position that a fiduciary relationship between Plaintiffs and Parker and/or Northstar was not formed until Plaintiffs purchased the Policy. "[A] fiduciary relationship exists when a confidence is reposed by one party in another

---

[2] Because Plaintiffs' negligence claim is dismissed as time-barred, the Court need not and does not address Northstar's claims regarding the admissibility of expert testimony as to Northstar's alleged duties to Plaintiffs.

with resulting superiority and influence exercised by the other." *Doe v. Roman Catholic Archdiocese of Indianapolis*, 958 N.E.2d 472, 477 (Ind. Ct. App. 2011). Nevertheless, the Court agrees that Plaintiffs' fraud and fraud in the inducement claims are distinct from their negligence claim. In their negligence claim, Plaintiffs allege that Parker negligently failed to obtain a specific type of insurance and ensure that policy performed as expected. Plaintiffs' actual fraud and fraud in the inducement claims, in contrast, allege that Northstar and Parker made material misrepresentations and omissions about the design, effect, and maintenance of the Policy with the intent to deceive Plaintiffs, and induced the Duffys to purchase the Policy. Although this distinction may be slight, any doubt as to what statute of limitations to apply must be resolved in favor of applying the longer period. *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1249 (Ind. Ct. App. 1998). The Court thus applies the six-year statute of limitations to Plaintiffs' actual fraud and fraud in the inducement claims, to the extent they are based on misrepresentations made before the Duffys purchased the Policy.

Plaintiffs' fraud claims based on later misrepresentations about the Policy's performance, however, are substantively the same as Plaintiffs' negligence claim. All of these claims arise from the Policy's failure to perform as expected. The two-year statute of limitations therefore applies to Plaintiffs' fraud claims arising from misrepresentations made after the Policy's issuance, and those claims are time-barred.

Plaintiffs' claim for constructive fraud is likewise substantively the same as Plaintiffs' negligence claim. While Plaintiffs' actual fraud and fraud in the inducement claims arise from alleged misstatements about the Policy, Plaintiff's constructive fraud claim arises from the Policy's failure to perform as expected, and the resultant breach of Parker's fiduciary relationship with Plaintiffs. Specifically, the Complaint alleges:

29.     Defendant Parker represented to Plaintiffs his *expertise in procuring a premium financed life insurance product thereby creating a duty* to Plaintiffs arising from the special relationship so created between Plaintiffs and Defendants.

30.     Parker breached the duty by providing inaccurate, incomplete and erroneous information and disclosures to Plaintiffs *regarding the performance of the Policy* he sold to Plaintiffs and Plaintiffs['] resulting ability to maintain the Policy in force.

31.     Plaintiffs justifiably relied upon Parker's misrepresentations regarding the Policy.

32.     *The Policy failed to perform* as represented by the Defendants.

33.     *As a result of such failure of the policy to perform*, Plaintiffs have been damaged by the loss of the Policy, loss of the premium investment, loss of their line of credit and ability to borrow, interest, attorney's fees and costs.

([Filing No. 1-1 at 7](#) (emphasis added)).

Plaintiffs' constructive fraud claim is a restatement of their negligence claim. Both claims allege that Parker owed Plaintiffs a duty to procure a specific insurance policy and ensure that it performed as promised, but he breached that duty. The two-year statute of limitations therefore applies to Plaintiffs' constructive fraud claim, and that claim is time-barred.

In their response brief, Plaintiffs argue that their fraud claims are subject to the statute of limitations for fraud claims, and not negligence claims, because their claims adequately assert each of the elements of a fraud claim, and applying the negligence statute of limitations would essentially nullify the six-year statute of limitations for fraud. Plaintiffs rely on *Lawyers Title Insurance Corp. v. Pokraka*, 595 N.E.2d 244 (Ind. 1992), and *Wells v. Stone City Bank*, 691 N.E.2d 1246 (Ind. Ct. App. 1998). Neither case is applicable here. In *Lawyers Title*, the defendant allegedly failed to record a mortgage, and plaintiff sued for breach of contract. The defendant argued that Indiana's two-year statute of limitations should apply because "'the substance of a cause of action is ascertained by an inquiry into the nature of the alleged harm,'" and plaintiff alleged a property harm, which is compensable under tort law. *Lawyers Title*, 595 N.E.2d at 246 (quoting

*Whitehouse v Quinn*, 477 N.E.2d 270, 274 (Ind. 1985)). The Indiana Court of Appeals disagreed, holding that applying a statute of limitations for fraud and breach of oral contract based solely on the type of harm alleged "would be tantamount to judicially repealing these six-year statutes of limitations because a recovery on theories of fraud or breach of an oral contract would always involve either personal injury or damage to property." *Id.* at 247. Similarly, in *Wells*, the defendant argued that the two-year statute of limitations should apply to the plaintiff's breach of contract claim because plaintiff alleged loss of reputation and loss of business income, which are personal injuries. *Wells*, 691 N.E.2d at 1248. The *Wells* court, citing *Lawyers Title*, held that the two-year statute of limitations did not apply "just because some of the consequential damages [the plaintiff] allege[d] might be more appropriately sought in a tort action." *Id.* at 1250.

In sum, *Lawyers Title* and *Wells* held only that the applicable statute of limitations should not be determined based solely on the type of harm alleged. *Schuman v. Kobets*, 698 N.E.2d 375, 378 n.2 (Ind. Ct. App. 1988), *aff'd in relevant part*, 716 N.E.2d 355, 356 (Ind. 1999) ("In *Lawyers*, our supreme court rejected the contention that all claims involving personal injuries or injuries to personal property would be governed by the two-year statute of limitations found at Ind. Code § 34-1-2-2(1) . . . ."). Neither case held, as Plaintiffs contend, that all adequately alleged fraud claims are always subject to the six-year statute of limitations. *Id.* ("We believe that the *Lawyers* court did not intent to impliedly overrule the well-established authority [holding that the substance of an action determines the applicable statute of limitations] and, therefore, we believe that *Lawyers* should be limited to its facts.").

Here, while Plaintiffs' Complaint might allege each of the elements of fraud, some of those fraud claims are nevertheless substantively the same as Plaintiffs' negligence claim. The Court therefore finds that Plaintiffs' actual fraud and fraud in the inducement claims based on

misrepresentations or omissions made after issuance of the Policy and Plaintiffs' constructive fraud claim are governed by Indiana's two-year statute of limitations. As with Plaintiffs' negligence claim, these fraud claims accrued no later than March 2019 and are therefore time-barred.

### 3. **Plaintiffs' Breach of Contract Claim**

In their Complaint, Plaintiffs allege that "Plaintiffs and Defendants entered a life insurance contract (Policy No. 60078973[)]," and that "Defendants breached the life insurance contract" (Filing No. 1-1 at 6–7). However, Plaintiffs appear to have abandoned their claim that Northstar has breached the Policy, and now claim that Northstar entered into and breached an oral contract, under which Northstar agreed to "procure a life insurance policy for The Duffys which would, among other things, provide them with a stream of income in retirement and that would be an asset that they could put on their balance sheet" (Filing No. 68).

Indiana state and federal courts have repeatedly held that breach of contract claims against insurance agents alleging a failure to obtain particular insurance coverage are, in substance, negligence claims. *See Lift–A–Loft Corp. v. Rhodes-Roper-Love Ins. Agency, Inc.*, 975 F.2d 1305, 1309 (7th Cir. 1992) (observing that "a review of the record reveals that the allegations" of the plaintiff's breach of contract count "are vague at best and simply restate [the plaintiff's] claim for negligence" and holding that Indiana's two-year statute of limitations applied); *Page v. Hines*, 594 N.E.2d 485, 486–87 (Ind. Ct. App. 1992) (holding that breach of contract claim against insurance agent alleging failure to procure particular type of insurance coverage sounded in negligence and was subject to the two-year statute of limitations); *Butler v. Williams*, 527 N.E.2d 231, 232–34 (Ind. Ct. App. 1988) (stating that "appellees have not provided . . . any details about the nature of the contract they claim was breached," and that "[t]he nature of substance of the cause of action is negligence in failing to obtain a particular type of insurance coverage," so the two-year statute of limitations applied).

Plaintiffs contend that Northstar breached an oral contract with them by failing to procure an insurance policy that would achieve the Duffys' retirement goals (Filing No. 68 at 28). Under well-settled Indiana law, this type of breach of contract claim sounds in negligence and is governed by Indiana's two-year statute of limitations. Plaintiffs' breach of contract claim is therefore time-barred and must be dismissed.

**C.      Whether Plaintiffs Have Shown Actionable Misrepresentations**

Northstar next argues that Plaintiffs' fraud claims must be dismissed because Plaintiffs cannot identify any actionable misrepresentation by Northstar. In response, Plaintiffs identify seven alleged misrepresentations made by Northstar and/or Parker on which the Duffys allegedly relied to their detriment. The Court will address each alleged misrepresentation in turn.

**1.      Misrepresentation about Parker and Coulter's Prior Deals**

First, Plaintiffs assert "Parker and Kim Coulter told David Duffy that they had done hundreds or thousands of premium finance deals *together*" (Filing No. 68 at 22 (emphasis in original)). To the extent Parker made this misstatement, Northstar is not vicariously liable because the misstatement was made before Parker was Northstar's apparent agent. As explained above, any apparent agency relationship arose when Northstar provided the Duffys with analytical models purportedly prepared by Parker, and when it placed Parker in a position to help the Duffys complete and submit their policy application and underwriting paperwork. All of these manifestations occurred after the introductory phone call between David Duffy, Parker, and Coulter. At the time of the introductory call, the only manifestation of an agency relationship between Northstar and Parker was Parker's alleged statement that he had worked with Northstar in the past. But a statement by an agent cannot create an apparent agency relationship. *Arrendale*, 183 N.E.3d at 1068.

20

Northstar cannot be held directly liable for this alleged misstatement, either. Again, as explained above, the designated evidence shows that Coulter never told David Duffy that Northstar had previously worked with Parker. Northstar is therefore neither derivatively nor directly liable for the alleged misstatement about Coulter and Parker's past work together.

### 2.  <u>Misrepresentation about Policy Being Listed on Balance Sheet</u>

Second, Plaintiffs assert that Coulter and Parker misrepresented to David Duffy "that the Policy at issue could be listed as an asset on his balance sheet" ([Filing No. 68 at 23](#)). However, there is no designated evidence supporting Plaintiff's assertion. In  his deposition, David Duffy testified that Parker told him generally that "*people* put [the value of similar policies] . . . on *their* asset sheet," ([Filing No. 69-5 at 24](#)), not that the Duffys could put the value of the Policy at issue on their balance sheet. Parkers deposition confirms that he never made any such statement, though he believes a former employee at Stock Yards Bank did ([Filing No. 69-6 at 64](#) ("Q: Did you ever tell the Duffys that that the accumulated value of the life insurance policy could be added to their asset column on any balance sheet? A: I didn't tell them that, no."). None of the designated evidence shows that Coulter ever made any such misrepresentation. Northstar is therefore not derivatively or directly liable for this second alleged misstatement.

### 3.  <u>Misrepresentation about Design of Policy</u>

Third, Plaintiffs state that "Northstar and/or Parker told David Duffy that the premium finance life insurance program was designed to create a stream of income in retirement when, in fact, such was not true" ([Filing No. 68 at 23](#)). Plaintiffs cite designated evidence supporting this contention, and Northstar does not offer any opposing evidence. Instead, Northstar argues that any such misrepresentation about the design of the Policy "is directly contrary to the documents that were previously referenced and which the Duffys signed shortly before Allianz issued the Policy" ([Filing No. 70 at 17](#)–18). Northstar appears to refer to the Allianz Supplement to the Life Insurance

Application Personal Financial Questionnaire ("Supplemental Application"), which Plaintiffs signed on March 5, 2015 (Filing No. 48-8). Northstar essentially argues that Plaintiffs' reliance on any misstatement about the purpose of the Policy could not have been reasonable in light of the information contained in the Supplemental Application. The Court agrees.

In Indiana, "[t]he traditional rule has been that reliance is not justified where the injured party has a written instrument available and fails or neglects to read it." *Plough v. NN Investors Life Ins. Co., Inc.*, 583 N.E.2d 1233, 1237 (Ind. Ct. App. 1992). Indiana courts have made an exception to this rule for complex insurance contracts. In *Medtech Corporation v. Indiana Insurance Company*, 555 N.E.2d 844 (Ind. Ct. App. 1990), *transfer denied*, the Indiana Court of Appeals stated that "[g]iven the complexity of today's insurance contracts [the court] cannot say as a matter of law, that such reliance [on contrary statements by an agent is] unjustified." *Id.* at 850. Accordingly, "whether a party's reliance upon an agent's representations is reasonable even though he failed to exercise the opportunity to read the policy is a question of fact for the factfinder." *Plough*, 583 N.E.2d at 1237.

However, this exception is limited, as the Court of Appeals explained in *Wiggam v. Associates Financial Services of Indiana, Inc.*, 677 N.E.2d 87 (Ind. Ct. App. 1997). In *Wiggam*, the plaintiffs, Mr. and Mrs. Wiggam, applied for a personal loan from defendant Associates Financial Services of Indiana, Inc. ("AFS"). During the application process, AFS offered to procure single credit life insurance ("Credit Life insurance") and credit accident and health insurance ("Credit Disability insurance") on the loan, which would make payments on the loan if the Wiggams became disabled and could not pay. The Wiggams decided to purchase the insurance, which was reflected on the Wiggams' two-page loan application. A portion of the application, titled "INSURANCE," showed Mr. Wiggam's signature next to the premium amounts and under the

respective sentences, "I want single credit life insurance," and "I want credit accident and health insurance." *Id.* at 88.

A couple of years later, the Wiggams applied for a second personal loan through AFS. The AFS employee who assisted the Wiggams with this transaction offered to procure the same Credit Life and Credit Disability insurance that covered the Wiggams' first loan, and the employee ensured the Wiggams that if one of them became disabled, the insurance would continue making payments on the second loan. The Wiggams completed a second loan application form, which was identical to the two-page application for the first loan. In the "INSURANCE" section of the second application, Mr. Wiggam signed next to the premium for the Single Credit life insurance and under the words "I want single credit life insurance." However, the stated premium for the credit accident and health insurance was "–0–," and Mr. Wiggam did not sign under the words "I want credit accident and health insurance." *Id.* at 88–89.

A few years later, Mr. Wiggam became totally disabled, and the Wiggams made a claim to AFS for Credit Disability insurance benefits. AFS informed the Wiggams that they had Credit Disability insurance for only the first loan and not the second loan. The Wiggams filed suit against AFS, alleging negligence, estoppel, and fraud. The trial court granted summary judgment in favor of AFS. The Wiggams appealed, arguing that under *Medtech*, the Wiggams' reliance on the AFS employees' misrepresentations about their insurance coverage were reasonable despite the terms of the second loan application. AFS responded that *Medtech* did not apply because the case did not involve a complex insurance contract. The *Wiggam* court agreed with AFS:

The court explained that the holding in *Medtech* was justified by the nature and complexity of insurance contracts . . . . [T]he exception described in *Medtech* simply has no application here. This case does not involve the terms of a complex insurance policy. Rather, it involves a few clear

terms in a two-page application for insurance. Nor is this a contract of adhesion under which one must accept the terms of a pre-printed insurance policy as they are written or decline coverage altogether. It is clear from the face of the loan application that, while the Wiggams may not have had any meaningful choice as to the terms of the Credit Life or Credit Disability policies, they were free to choose whether or not their loan would be covered by either of these policies.

*Wiggam*, 677 N.E.2d at 91.

Here, the document contradicting Parker and Northstar's purported misrepresentations about the design of the Policy is not a complex insurance contract, like the contracts in *Medtech* or *Plough*. Rather, it is the simple, two-page Supplemental Application, like the application in *Wiggam*. On the second page of the Supplemental Application, the applicant is asked to identify the purpose of the policy. That portion is shown below:

Please check purpose for death benefit need:
- ☐ Income Replacement  ☐ Retirement Income  ☒ Estate Preservation  ☐ Final Expenses
- ☐ Charitable Giving – Provide annual donation amount  $_____
- ☐ Mortgage Protection – Provide mortgage amount  $_____
- ☐ Debt repayment/loan protection – Loan amount  $_____  (Provide a copy of the loan)
- ☐ Other:_____

([Filing No. 48-8 at 3](#)). The Duffys could have checked the "Retirement Income" box, which was the purpose they had intended the Policy to serve, but they instead checked the "Estate Preservation" box. It is clear from the face of the Supplemental Application that the purpose of the Policy was estate preservation, not retirement income. As such, as a matter of law, Plaintiffs could not reasonably have relied on Parker and Northstar's alleged assurance that the Policy was designed to create retirement income.

### 4.   Implicit Misrepresentation about Parker's Qualifications

Fourth, Plaintiffs argue that by presenting the Duffys with illustrations purportedly prepared by Parker, Northstar and Parker "implicitly represent[ed] that Parker had the skill,

expertise and knowledge to advise The Duffys about their investment," even though Parker did not prepare any of the illustrations (Filing No. 68 at 23). Northstar replies that Plaintiffs have not identified any misrepresentation, "but merely a legal argument attempting to extrapolate illustrations that indicate they are estimates into a 'representation' about Parker" (Filing No. 70 at 18). The Court again agrees with Northstar.

Plaintiffs have not identified any statement or omission by Northstar. They have identified only the Duffys' assumptions, and they offer no caselaw supporting their position that implied assertions or assumptions can form the basis of a fraud claim. Indiana caselaw clearly holds that fraud claims must be based on an affirmative misrepresentation or an omission. Northstar's alleged "implicit[]" misrepresentation about Parker's qualifications is neither of those, so it cannot form the basis for a fraud claim.

### 5.  **Misrepresentation about Parker's Title**

The next alleged misrepresentation is a similar implied misstatement that is not actionable. Plaintiffs state that Parker signed the Northstar illustrations as a "Financial Professional," despite admitting that "he was not an accountant, nor a financial planner or even a financial advisor," that the financial risks associated with a premium financed life insurance were "'way out of his league,'" and that "he was unable to render advice to The Duffys as to whether to purchase the Policy because he was not qualified" (Filing No. 68 at 23). Plaintiffs appear to argue that the illustration's use of the phrase "financial professional" implied that Parker was qualified to advise the Duffys regarding the Policy. For the reasons explained above, the Duffy's assumptions about Parker's qualifications based on the phrase "financial professional" are not an actionable misrepresentation or omission on which to base their fraud claims.

6. **Misrepresentation about Performance of Policy**

Plaintiffs assert that "[a]fter the policy at issue was issued, Parker repeatedly told David Duffy that the Policy was performing well when, in fact, it was failing" (Filing No. 68 at 23). Northstar replies that this allegation "do[es] not relate to Northstar" but does not address whether the statement is actionable. As an initial matter, for the reasons discussed above, Plaintiffs' fraud claims based on misrepresentations made after issuance of the Policy are time-barred. But even assuming the fraud claims based on these post-issuance misrepresentations were not time barred, they still would not survive summary judgment because Plaintiffs have not identified the alleged misrepresentations with adequate particularity.

Federal Rule of Civil Procedure 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. Pro. 9(b). To plead with the requisite particularity, the plaintiff must provide more than conclusory allegations, *see Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir.1990), and detail "the who, what, when, where, and how." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Stated differently, the plaintiff must "identi[fy] . . . the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003) (citation omitted).

In their Complaint and response brief, Plaintiffs identify only the "who"—Parker—and the "what"—the Policy's performance (Filing No. 1-1 at 7 (alleging Parker "provid[ed] inaccurate, incomplete and erroneous information and disclosures to Plaintiffs regarding the performance of the Policy"); Filing No. 68 at 23). Plaintiffs do not identify when Parker made these alleged statements, beyond the general allegation that they were made "repeatedly" throughout several

years following the Policy's issuance. Plaintiffs likewise do not specify where Parker or David Duffy were when the statements were made, or the method by which Parker made them.

Plaintiffs' designated evidence does not provide this necessary information, either. Plaintiffs cite only David Duffy's affidavit, in which he states that during the first three to four years of the Policy, "James Parker repeatedly told [him] that [the] investment was doing very well and was performing as expected" (Filing No. 69-3 at 1). This assertion does not state when, where, or how Parker made the alleged misrepresentations about the Policy's performance, and Plaintiffs have therefore failed to satisfy Rule 9's particularity requirement. In the absence of adequate pleading and evidence, Northstar is entitled to summary judgment. *See Young v. Indianapolis Metro. Police Dep't*, No. 22-cv-00301, 2023 WL 3848377, at *7 (S.D. Ind. June 6, 2023) (granting summary judgment to defendants on fraud claim because statement that "[p]laintiff was told [she] was going to the hospital to have a rape kit done at a hospital" did not satisfy the Rule 9 heightened pleading requirement); *Wine & Canvas Development LLC v. Weisser*, No. 11-cv-01598, 2014 WL 4053928, at *15 (S.D. Ind. Aug. 15, 2014) (granting summary judgment to defendant because plaintiff failed to plead fraudulent misrepresentation with sufficient particularity).

### 7. Misrepresentation about Monthly Policy Premiums

Plaintiffs lastly claim that "Parker and/or Northstar advised The Duffys that their supposed $2000 per month investment was an 'investment' but it was actually a loan interest payment" (Filing No. 68 at 23). Plaintiffs do not cite any designated evidence supporting this assertion. David Duffy's deposition, though, directly contradicts it. In his deposition, David Duffy was asked "Did anybody tell you what the $2,000 payment was for?" and David Duffy responded "*No.* They just told -- I *thought* it was for putting into -- to help feed the fund" (Filing No. 69-5 at 25 (emphasis added)). The undisputed evidence shows that neither Parker nor Northstar made a misrepresentation to David Duffy about their monthly premium being an "investment."

27

Because Plaintiffs have failed to identify any actionable misrepresentation by Parker or Northstar, Northstar is entitled to summary judgment on Plaintiffs' fraud claims that are not time-barred.

**D.      Whether an Oral Contract Existed**

Northstar lastly argues that Plaintiffs' breach of contract claim must be dismissed because it fails to identify a contract between Plaintiffs and Northstar (Filing No. 48 at 32). Northstar asserts that Plaintiffs' breach of contract claim, as alleged in the Complaint, is based on the Policy between Plaintiffs and Allianz, and does not apply to Northstar. Northstar continues that instead of conceding that they have no contract claim against Northstar, Plaintiffs have post-hoc constructed a claim for breach of oral contract, which Plaintiffs and Northstar allegedly formed through "the sum of the written communications, emails, oral representations, and actions of [*sic*] the part of Northstar, including its agent, James Parker" (Filing No. 48). Northstar argues that this breach of oral contract claim should be dismissed as insufficiently pled. *Id.*

Plaintiffs respond that they have adequately alleged the basic elements of contract formation: offer, acceptance, and consideration. They state:

> Northstar offered to provide a life insurance policy for The Duffys which would, among other things, provide them with a stream of income in retirement and that would be an asset that they could put on their balance sheet. As is obvious from the conduct of the parties discussed throughout the Response, The Duffys accepted Northstar's offer. Northstar received consideration in the form of a commission from the sale of the life insurance policy to The Duffys.

(Filing No. 68 at 28).

As an initial matter, the Court notes that Plaintiffs' breach of contract claim is untimely and must be dismissed for that reason. But even if the claim were timely, the Court agrees with Northstar that it is insufficiently alleged.

"An oral or written contract to procure insurance requires a meeting of the minds on five critical elements: '(1) the subject of the insurance; (2) the risk or peril insured against (3) the amount of coverage; (4) the limit and duration of the risk; and (5) the amount of premium to be paid." *Ind. Restorative Dentistry, P.C. v. Laven Ins. Agency, Inc.*, 27 N.E.3d 260, 269 (Ind. 2015). The Plaintiffs' claim for breach of oral contract, as alleged in their response brief, only generally alleges the goals of the insurance policy Northstar agreed to procure. It does not contain factual allegations adequate to plead a claim for breach of oral contract. Plaintiffs' breach of contract claim against Northstar is therefore subject to dismissal for this additional reason.

## IV.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendant Northstar Funding Partners' Motion for Summary Judgment (Filing No. 45). Plaintiffs Charlene Cestroni, Trustee of Duffy Asset Management, LLC, David Duffy, and Lynel Duffy's claims against Northstar are **DISMISSED** on summary judgment. With no other claims remaining to be adjudicated, all other pending motions (Filing No. 55, Filing No. 82, Filing No. 93, Filing No. 102, Filing No. 103 and Filing No. 104) are **DENIED as moot**, and the final pretrial conference and the trial are **VACATED**. Final judgment will issue under separate order.

**SO ORDERED**.

Date:    12/28/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

29

Distribution:

E. Davis Coots
COOTS HENKE & WHEELER, P.C.
dcoots@chwlaw.com

Joseph Reel Delehanty
Dickinson Wright PLLC
jdelehanty@dickinson-wright.com

Logan J. Mayfield
Dickinson Wright PLLC
lmayfield@dickinsonwright.com

David A Owen
Dickinson Wright PLLC
dowen@dickinsonwright.com

Jeffrey S. Zipes
COOTS HENKE & WHEELER
jzipes@chwlaw.com